Matter of Sariyah T. (Deidre R.) (2025 NY Slip Op 02637)

Matter of Sariyah T. (Deidre R.)

2025 NY Slip Op 02637

Decided on May 1, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:May 1, 2025

CV-24-0616
[*1]In the Matter of Sariyah T. and Another, Alleged to be Neglected Children. Ulster County Department of Social Services, Respondent; Deidre R., Appellant. (Proceeding No. 1.)
In the Matter of Sariyah T. and Another, Alleged to be Neglected Children. Ulster County Department of Social Services, Respondent; Deidre R., Appellant. (Proceeding No. 2.)

Calendar Date:March 27, 2025

Before:Garry, P.J., Egan Jr., Reynolds Fitzgerald, McShan and Mackey, JJ.

Constantina Hart, Kauneonga Lake, for appellant.
Ulster County Department of Social Services, Kingston (Jesse Mernin of counsel), for respondent.
Claudia S. Davenport, Kingston, attorney for the children.

Garry, P.J.
Appeals (1) from an order of the Family Court of Ulster County (Kerri Savona, J.) entered April 17, 2024, which, among other things, granted petitioner's application, in proceeding No. 1 pursuant to Family Ct Act article 10, to adjudicate the subject children to be neglected, and (2) from an order of said court, entered April 17, 2024, which granted petitioner's application, in proceeding No. 2 pursuant to Family Ct Act article 10, to hold respondent in willful violation of an order of protection, and committed respondent to jail for six months.
Respondent (hereinafter the mother) is the mother of the two subject children (born in 2016 and 2018). She allegedly overdosed in her home in October 2022 while the younger child was in her sole care. Both children were removed from the mother's care thereafter pursuant to Family Ct Act § 1024 and placed with relatives. The subject neglect proceeding was then commenced and a Family Ct Act § 1027 hearing was held, after which Family Court ordered the continued removal of the children. Family Court later issued a temporary order of protection against the mother requiring, as relevant here, the mother to stay away from the children, except for visitation at petitioner's discretion, as well as their respective residences, without exception. Petitioner subsequently filed a petition against the mother for her alleged violation of that order in visiting the younger child's residence. Following a combined fact-finding hearing on both petitions, Family Court made several neglect and derivative neglect findings with respect to the children and determined that the mother willfully violated the order of protection. Following a combined dispositional hearing, the court continued the placement of the children, imposed various terms of supervision upon the mother and committed her to jail for 180 days, authorizing her release to an inpatient treatment facility if appropriate placement was found. The mother appeals.[FN1]
"Neglect is established when a preponderance of the evidence shows that the children's physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired and that the actual or threatened harm to the children results from the parent's failure to exercise a minimum degree of care in providing the children with proper supervision or guardianship" (Matter of Damiek TT. [Damiek UU.], 232 AD3d 1157, 1157 [3d Dept 2024] [internal quotation marks and citations omitted]; see Family Ct Act §§ 1012 [f] [i] [B]; 1046 [b] [i]). Although not specifically defined in the Family Ct Act, "derivative neglect" may be found "where the evidence demonstrates an impairment of parental judgment to the point that it creates a substantial risk of harm for any child left in that parent's care" (Matter of Jade F. [Ashley H.], 149 AD3d 1180, 1181-1182 [3d Dept 2017] [internal quotation marks, brackets and citations omitted]; see Matter of Hazelee DD. [Nicholas EE.], 222 AD3d 1223, 1227 [3d Dept 2023[*2]]).
On the date in question, a self-described friend of the mother called 911 to report that she was found unconscious on the floor of her apartment and that her lips were turning blue. The caller declined to identify himself before providing a false name and stated, "I think she's overdosing" and "I know that she does drugs." He specified, "there's Xanax everywhere" and "I know she does heroin." When asked if there was a needle by her, he added, "I think she sniffs." Prior to calling 911, the caller had already administered Narcan, which he had found in the mother's drawer, notably offering that he "could only find one" dose. Law enforcement later identified the caller, referred to herein as Elijah.
Paramedics arrived to discover the mother cyanotic, unawake and breathing very slightly. Several feet away was the visibly upset younger child, in a high chair pushed up to a dining room table. On that table, and within the younger's child's reach, was a pill grinder, a piece of notebook paper with a crease in it and a short red straw on the paper, each of which had a white powdery substance on it. Several prescription medication bottles were present on other surfaces in the apartment; to the extent the labels can be read, the medications were prescribed to the mother and appear to be antidepressants. Unused hypodermic needles were observed on the kitchen counter and in one open upper cabinet. A head-to-toe scan of the mother revealed no obvious injuries to explain her unresponsiveness. Her airway was partially obstructed by her tongue, a common occurrence in overdoses, according to the paramedic who testified at the hearing. The paramedic also recalled that the mother had "pinpoint pupils" — a "textbook sign of some sort of narcotic overdose." Those signs, in addition to the mother's decreased respirations and unresponsive mental state, led the paramedic to believe that this was a narcotic overdose and to administer two additional rounds of Narcan, one intranasally and then one through an IV with saline. After a couple of minutes following the IV, the mother regained consciousness and was breathing normally. Although there were inconsistencies between the paramedic's testimony and his incident report, Family Court fully credited his testimony. That paramedic, who had responded to hundreds of overdoses, testified that he could say with certainty that the mother had used opiates and overdosed.
About an hour after arriving at the hospital, the mother reported to law enforcement that Elijah had injected her with an unknown substance, causing her to lose consciousness. She recanted that statement by the end of her interview. The hospital records admitted into evidence do not include a toxicology report, and they seem to reflect that her drug screen was canceled after she left the hospital against medical advice.[FN2] The testimony at the hearing was internally inconsistent regarding the testing performed on the white powdery substance found in the mother's [*3]apartment, including whether the substance was tested for fentanyl only or for both fentanyl and heroin and whether an inadequate sample quantity would return a "negative" result or an "inconclusive" one.
In the days following the incident, the mother reported to a caseworker that she had simply fallen and hit her head. That caseworker spoke with the older child on two separate occasions following the incident, who offered that Elijah would get needles from Rite Aid and use them to give himself medicine in his arm, demonstrating a plunger motion, because he had a "boo boo" that he could not fix. When asked if Elijah gave medication to the mother in that way, the older child stated that Elijah gave her medicine "like you would take Tylenol," but "it didn't make her better, . . . it makes her throw up." The older child also relayed that the mother and Elijah would go into the apartment bathroom for long periods of time and that she and the younger child would be told to stay in their room. The mother generally denied any drug use or knowledge of the drug paraphernalia in her apartment when questioned by law enforcement and her caseworker. However, she did not testify or present any witnesses at the hearing, and Family Court accordingly granted petitioner's application to draw a negative inference against her.
Family Court determined that the mother's actions, in abusing opiates in the presence of the younger child and in placing him in close proximity to the opiates, placed him at imminent risk of harm, constituting neglect as to the younger child, and evidenced such impaired parental judgment as to warrant a finding of derivative neglect as to the older child. The court also concluded that the mother neglected both children by exposing them to illicit drug use on other occasions and by leaving them unattended for periods of time while she and her acquaintance abused same. Although the hearing evidence was not without inconsistencies, where, as here, a respondent parent chooses not to testify, Family Court is empowered to draw the strongest negative inference against that parent as the opposing evidence allows (see Matter of Nassau County Dept. of Social Servs. v Denise J., 87 NY2d 73, 79 [1995]; Matter of Kylee R. [David R.], 154 AD3d 1089, 1090 [3d Dept 2017], lv denied 30 NY3d 911 [2018]). According deference to the court's factual findings and credibility determinations regarding the presence and abuse of opiates (see Matter of Joshua R. [Kimberly R.], 216 AD3d 1219, 1220 [3d Dept 2023], lv denied 40 NY3d 905 [2023]), and noting that the relatively low corroboration requirement with respect to the older child's out-of-court statements was satisfied (see Family Ct Act § 1046 [a] [vi]; Matter of Lawson O. [Andrew O.], 176 AD3d 1320, 1321 [3d Dept 2019], lv denied 35 NY3d 902 [2020]), a sound and substantial basis exists in the record to support Family Court's findings of neglect and derivative neglect (see Matter of Hazelee DD. [Nicholas EE.], [*4]222 AD3d at 1226-1227; Matter of Alexander P. [Jillian P.], 216 AD3d 1455, 1456 [4th Dept 2023]; Matter of Grace F. [Nicole F.], 144 AD3d 680, 680-681 [2d Dept 2016]; Matter of Jaielly R.H. [Kimberly V.], 132 AD3d 993, 993 [2d Dept 2015]; Matter of Brandon R. [James U.], 114 AD3d 1028, 1028-1029 [3d Dept 2014]).
As for the violation petition, Family Court took judicial notice of the operative temporary order of protection, which imposed a clear and unequivocal mandate upon the mother to stay away from the children's respective residences. The hearing evidence demonstrated that, after petitioner, citing the order of protection, denied the mother's request to attend the younger child's birthday party at his residence, the mother nonetheless went to the younger child's home during the party, "hollering" and "screaming" until permitted to see him. The maternal grandmother reported the violation to petitioner, and the mother admitted to her conduct when later questioned by a permanency caseworker. This evidence constitutes the requisite clear and convincing evidence of willfulness (see generally Matter of Cori XX. [Michael XX.-Katherine XX.], 155 AD3d 113, 115 [3d Dept 2017).
Egan Jr., Reynolds Fitzgerald, McShan and Mackey, JJ., concur.
ORDERED that the orders are affirmed, without costs.

Footnotes

Footnote 1: We exercise our discretion to overlook the various defects in the mother's premature notice of appeal and deem her appeal to be validly taken from the above orders (see CPLR 5520 [c]).

Footnote 2: The records admitted into evidence include information concerning the hospital's treatment of the mother on prior occasions. It appears that, in 2017, the mother self-reported daily recreational drug use, including of benzodiazepines (depressants) and oxycodone (an opioid).